IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION


ALDDINE MONTS,

     Plaintiff,

                               CIVIL ACTION FILE
v.                             NO.:  1:13-CV-154

CITY OF AMERICUS, GEORGIA,
POLICE DEPARTMENT, DARRELL
AMBOS, and LESLIE GAITER,

     Defendants.



          Deposition of LESLIE GAITER,

taken in the above styled case on the 8th day of July, 2014,

at the Sumter County Courthouse, 500 West Lamar Street, Room

D-1 Number 318, Americus, Georgia; commencing at

approximately 10:07 a.m., before Judy B. Scott, Certified

Court Reporter B-1487, Georgia.


APPEARANCES:

     FOR THE PLAINTIFF:        THOMAS G. LEDFORD, ESQ.
                               P.O. Box 287
                               Albany, GA 31702

     FOR THE DEFENDANTS:       KENDRICK K. McWILLIAMS, ESQ.
                               Caller Service Number 1808
                               Alpharetta, GA 30323-1808

     ALSO PRESENT:             ALDDINE MONTS


                           JUDY B. SCOTT
                      Certified Court Reporter
                         P.O. Box 70982
                 Albany, Georgia 31708-0982
                       (229) 431-1975

```
 1                        PROCEEDINGS

 2

 3         MR. LEDFORD:  Before I start, I want to say this

 4      deposition is taken pursuant to the Federal Rules of

 5      Civil Procedure, pursuant to Notice and by agreement.

 6      Is that correct, Mr. McWilliams?

 7         MR. McWILLIAMS:  It is.

 8

 9

10

11

12  Whereupon,

13                        LESLIE GAITER,

14  having first been duly sworn to tell the truth, testified as

15  follows:

16                      CROSS-EXAMINATION

17  BY MR. LEDFORD:

18      Q    Officer Gaiter, I'm Tom Ledford.  I'm Mrs. Monts'

19  attorney.  I'm going to be asking you some questions today.

20      A    Okay.

21      Q    If at any time you don't understand my question,

22  if you want me to repeat it for whatever reason --

23      A    Uh-huh (yes).

24      Q    -- just tell me, and I'll do so; okay?

25      A    Okay.
```

```
 1        Q     But if you answer, I'm going to assume that you've

 2   heard and understood my question.  Is that okay?

 3        A     Yes, sir.

 4        Q     And that you answered truthfully.  Is that

 5   agreeable?

 6        A     Yes, sir.

 7        Q     Give us your full name, please, sir.

 8        A     Leslie Gaiter, II.

 9        Q     What's your current address, Mr. Gaiter?
```

12        Q     And what is your date of birth, please, sir?

```
14              MR. LEDFORD:  And let's go off the record for just

15        a moment, please.

16              (Whereupon, a discussion was held off the record.)

17        Q     (By Mr. Ledford)  Are you married?

18        A     No, sir.

19        Q     Do you live with anyone?

20        A     No, sir.

21        Q     And I assume that you have relocated did you say

22   to Augusta?

23        A     Yes, sir.

24        Q     Are you employed there?

25        A     Yes, sir.
```

1      Q     Where do you work?

2      A     The Richmond County Sheriff's Office.

3      Q     And what is your position there?

4      A     Deputy Sheriff.

5      Q     When did you move?

6      A     I just moved in June.

7      Q     Have you got settled in?

8      A     Not really, but --

9      Q     You're still unpacking?

10     A     Yeah.

11     Q     I wanted to get into your history, personal

12   history, if I may --

13     A     Okay.

14     Q     -- briefly.  Why don't you tell us where you were

15   born and then where you lived generally from early childhood

16   and come forward.

17     A     Okay.  I was born in Colorado Springs, Colorado.

18   I lived in Dale City, Virginia.  I've lived in Buford,

19   Georgia, as well.  I graduated high school there and moved

20   to Americus in 2009, and now I live in Augusta.

21     Q     Yes, sir.  Tell us about your education.

22     A     High school education, just say I went to North

23   Gwinnett High School, like I say, graduated in 1997.

24     Q     Any education after high school?

25     A     No, sir; just the Police Academy, which they gave

1   you college credits for.

2        Q     Now, tell us about your employment history.   Why

3   don't you start with the first job you had --

4        A     Okay.

5        Q     -- and come forward.

6        A     Okay.   The first job I ever had was Arrow Lumber &

7   Supply, and that was in Suwanee, Georgia, and I got that

8   after I graduated, just loaded lumber onto forklifts.   I

9   worked for my family after that, and I worked for them for

10  about three years.   After I did that, I did private security

11  for a couple years with two different places.   And then I

12  went to work for my family again.   And in 2009, I went to

13  the Americus Police Department and left there this year to

14  go to the Richmond County Sheriff's Office.

15       Q     Your family has a business, I assume.

16       A     Yes, sir.

17       Q     What type of business?

18       A     They do -- they have a private security business.

19       Q     And where is that located?

20       A     It's in Virginia, but they also do -- they did

21  have some contracts in Atlanta as well.

22       Q     And what is the name of their business?

23       A     Nationwide Enforcement.

24       Q     Are you an owner --

25       A     No, sir.

1        Q       -- in any way?

2        A       No.

3        Q       Now, why don't you start with your first job in

4    law enforcement.

5        A       Okay.

6        Q       When was that?

7        A       2009 with the Americus Police Department.

8        Q       And what was your beginning position?

9        A       Patrolman.

10       Q       And what rank would that have been?

11       A       Just that's the basic rank.  That's starting at

12   the bottom.

13       Q       And what did you do as patrolman?

14       A       Responded to 911 calls, also patrolling the city

15   as well.

16       Q       You've been in law enforcement ever since then --

17       A       Yes, sir.

18       Q       -- ever since 2009?

19       A       Yes, sir.

20       Q       Without any break of any consequences?

21       A       No, sir.

22       Q       Tell us about your education and training as a law

23   enforcement officer.

24       A       Well, I went to Basic Mandate.  I've got

25   certifications also outside of the agency as well; but Basic

1    Mandate and then after working with the Department, I've had

2    other training that I've received afterwards.

3        Q    What's Basic Mandate?

4        A    Just going to the basic Police Academy.  I went

5    for 18 weeks.  And you get all your training that you would

6    get in any regional academy in the State of Georgia.

7        Q    Where was that at?

8        A    South Georgia Tech.

9        Q    Here in Americus?

10       A    Yes, sir.

11       Q    Now, after your first entry into law enforcement,

12   did you get any promotions?

13       A    No, sir.

14       Q    Have you ever been promoted?

15       A    No, sir.

16       Q    You're POST Certified?

17       A    Yes, sir.

18       Q    When were you POST Certified?

19       A    My first POST Certification, actually the date I

20   graduated, was March 2010.

21       Q    Now, I'm a layman, okay, and I don't know a whole

22   lot about a lot of things, including law enforcement.  Why

23   don't you tell me what is POST Certified.

24       A    Well, that's just the title they come up with, and

25   what it is, is by the State of Georgia you're mandated and

1   have arrest powers, powers of arrest throughout the State of

2   Georgia.

3       Q    What sort of training do you receive?

4       A    You get all types.  You get general law -- excuse

5   me -- you get criminal procedure, criminal law, traffic law,

6   and then various other training as well, field --

7   standardized field sobriety, taser training, emergency

8   vehicle operation, hazard materials, and just, I mean, a lot

9   of training.  They squeeze it all into 18 weeks.

10      Q    Yes, sir.  You get a little legal background and

11  training as well I've heard.

12      A    Yes, sir.

13      Q    And you've heard of the Miranda Rights --

14      A    Yes, sir.

15      Q    -- and various other rights and laws?  Let me ask

16  you this.  You served with the City of Americus Police

17  Department since 2009?

18      A    Yes, sir.  I was hired in 2009 and went to the

19  Academy and graduated in March 2010.

20      Q    Do you recall what month you were hired by

21  Americus P.D.?

22      A    Yes, sir; June 2009.

23      Q    And you worked continuously with the Americus P.D.

24  until you recently went to Augusta, and you work with the

25  Sheriff's Department there?

```
 1        A     Yes, sir.
 2        Q     And what county is that?
 3        A     That's Richmond County.
 4        Q     Richmond County?
 5        A     Yes, sir.
 6        Q     And the highest rank that you obtained at the
 7   Americus P.D., what was that?
 8        A     Police Officer.
 9        Q     Police Officer?
10        A     Yes, sir.
11        Q     That's the basic entry-level; is that correct?
12        A     Yes, sir.
13        Q     Now, the case in which we're here today on
14   involves a complaint by Mrs. Monts against you and Officer
15   Ambos --
16        A     Uh-huh (yes).
17        Q     -- and the Americus Police Department and the City
18   of Americus.  Have you ever at any time during your law
19   enforcement career, from 2009 forward to today, ever
20   received any complaints other than that by Mrs. Monts?
21        A     I received complaints.  Formal complaints, they
22   have to go through the procedures, and only one.  The other
23   ones, people haven't went through the procedure all the way.
24        Q     The others did not go through the proper
25   procedures --
```

```
 1      A     No, sir.

 2      Q     -- or completely through the procedures?

 3      A     No, sir.

 4      Q     Well, tell me about the procedures.  What are the

 5   procedures for making a complaint?

 6      A     You have to go and get a packet and fill it out

 7   and --

 8      Q     Where do you get that at?

 9      A     From the Americus Police Department, from a

10   supervisor.  And once they fill out the packet, it has to be

11   turned back in, and then it goes from there.  They did have

12   an Internal Affairs at that point.  They used to.  They

13   don't have one anymore, I don't believe, but I know the

14   procedure is you have to actually turn it in, and then it

15   goes from there.

16      Q     Now, on or about July the 27th of 2012, that being

17   the date of the incident for which Mrs. Monts has filed a

18   complaint, do you know whether or not she actually went

19   through the formal process of filing a complaint?

20      A     From my understanding, she did.

21      Q     She did?

22      A     Uh-huh (yes).

23      Q     Okay.  And if you'll answer yes or no --

24      A     Okay.  Yes.

25      Q     -- because the court reporter has got to get it --
```

```
 1        A     All right.  Yes.

 2        Q     -- I'd appreciate it.  And who would she have seen

 3   to start the complaint process, pertaining to the incident

 4   with you?

 5        A     Sergeant Norton.

 6        Q     And what is Sergeant Norton's position?

 7        A     He's an investigator.

 8        Q     For the Americus P.D.?

 9        A     Yes, sir.

10        Q     Is he in charge of Internal Affairs, so to speak?

11        A     He was at one point.

12        Q     Was he back then, on or about July the 27th of

13   2012, in charge of Internal Affairs with the Americus P.D.?

14        A     Yes, sir.

15        Q     So, she went to him, to your knowledge or

16   recollection, and obtained the paperwork to file a

17   complaint; is that correct?

18        A     Yes, sir.

19        Q     Have you at any time during your law enforcement

20   career, for any reason, ever been reprimanded?

21        A     Yes, sir.

22        Q     Tell us about the various times, if it's more than

23   one.

24        A     Okay.  I was reprimanded three times, and that was

25   my first year, once for mishandling evidence, and that
```

1    was -- and another time for an accident, and then a third

2    time for just not being aware of the -- well, I'm sorry --

3    two times, actually, and it was once for an accident and it

4    was another time for mishandling evidence.

5         Q    Well, tell us about the first one.

6         A    Okay.  The mishandling evidence was we were

7    sharing a car, me and another officer, and I found

8    something.  I wasn't sure what it was.  It was kind of

9    suspicious.  It looked like it might have been some type of

10   drugs or something, so we did collect it and put it in the

11   car and actually left it there and forgot about it, and the

12   shift change came and forgot to just drop it in the evidence

13   box.

14        Q    Did the evidence show up in the proper place

15   eventually?

16        A    Yes.

17        Q    Now, tell us about the second time.

18        A    I had a minor accident.  I was pulling into the

19   police department and turned and caught the side of the van

20   when I was turning into the parking space and got written up

21   for that.

22        Q    Now, have you ever been sued for any reason --

23        A    No.

24        Q    -- other than this time?

25        A    Yes.

1      Q      This is the first and only time?

2      A      Yes, sir, I hope so.

3      Q      Okay; all right.  Let me ask you -- I had served

4   you with certain papers, discovery, when the lawsuit was

5   served on you --

6      A      Uh-huh (yes).

7      Q      -- Interrogatories.  Does that ring a bell,

8   questions, written questions?

9      A      Yes, sir.

10     Q      Okay.  And it may be that these written questions

11  were served on you after that, after the service of the

12  lawsuit; but, anyway, you recall getting Interrogatories or

13  written questions --

14     A      Yes, sir.

15     Q      -- from my office?

16     A      Yes, sir.

17     Q      And I will refer you to Interrogatory Number 8.

18  Would you just read that for the record, just that first

19  paragraph?

20     A      Yes, sir.  "State the beginning dates of employ

21  for you with the City of Americus, Americus, Georgia, Police

22  Department in Americus, Sumter County, Georgia, stating

23  current status, current rank, listing all assessments and

24  annual review report scores since your employ, reason for

25  your low scores or less than satisfactory rating, and state

```
 1   if you have received a PIP, RIP, or Probationary Improvement
 2   Requirement in your file with any law enforcement or
 3   military agency."
 4        Q    Okay.  Now, I would refer you particularly to the
 5   portion of that Interrogatory Number 8 that pertains to PIP,
 6   RIP, or Probationary Improvement Requirement.  Are you
 7   familiar with those terms?
 8        A    No, sir.
 9        Q    Do you know what a Probationary Improvement
10   Requirement would be?
11        A    No, sir.
12        Q    Have you been placed on probation at any time in
13   your law enforcement career?
14        A    No, sir.
15        Q    You were not placed on probation for the incident
16   involving Mrs. Monts?
17        A    No, sir.
18        Q    Now, you've had taser training from your
19   testimony?
20        A    Yes, sir.
21        Q    Tell us what all was involved in that taser
22   training.
23        A    You get a knowledge of how the taser works, all
24   the working parts.  You go over the nomenclature of the
25   taser itself, and you're actually tased at the end.  It's
```

```
 1    optional, but I did the five seconds, which basically just
 2    the -- when you go over like the taser certification, you
 3    get all the knowledge of it and the working parts.
 4         Q    How does it feel to be tased?
 5         A    It hurts.
 6         Q    Yes, sir.  Can you describe it in a little more
 7    detail?
 8         A    Yes, sir.  It feels like a muscle spasm through
 9    your whole body.  You can feel your body actually lock up.
10         Q    What is the average length of the taser process?
11    How long does someone get tasered when they are tasered?
12         A    If it's correctly, in five seconds.
13         Q    Is five seconds then essentially the standard time
14    to taser someone?
15         A    Yes.
16         Q    Are you able to increase the length of time on
17    your taser gun?
18         A    No.
19         Q    Are you able to decrease the time?
20         A    No; unless you cut it off.
21         Q    There's a term called standard, a standard setting
22    for a taser gun.  What does that mean?
23         A    The standard setting is at five seconds each time
24    that it's deployed.  There are other drive stuns, but each
25    cycle is five seconds.
```

```
 1      Q      Now, you were trained in tasering when you went to
 2   POST?
 3      A      Yes, sir.
 4      Q      And how long -- how many times, rather, would the
 5   standard for tasing someone be?  How many times would you
 6   taser the average person?
 7      A      From my training, it would be as far as until
 8   you're able to get compliance.  You know, you may tase a
 9   person one time and then you try to give them commands again
10   and go from there.  If they don't comply, then you give them
11   a second one.  It wouldn't be a problem with that.
12      Q      Have you ever tasered anyone other than
13   Mrs. Monts?
14      A      Yes.
15      Q      How many times?
16      A      I never -- I didn't tase Mrs. Monts.
17      Q      I'm sorry.
18      A      Yes, sir.
19      Q      You were there when Mrs. Monts was tasered --
20      A      Yes, sir.
21      Q      -- by Officer Ambos?
22      A      Yes, sir.
23      Q      Have you ever tasered anyone?
24      A      Yes, sir.
25      Q      How many people?
```

```
 1      A     Two.

 2      Q     And can you tell us about those incidents, please?

 3      A     Yes, sir.  One person was going for a knife in a

 4   kitchen, and we had been trying to talk to them and talk

 5   them down.  When he went for the knife, I deployed my taser.

 6   I had another incident with a gentleman that told us he was

 7   going to shoot us and he resisted arrest, and I deployed my

 8   taser on him as well.

 9      Q     How many times did you taser each of those people?

10      A     Once.

11      Q     And both of these were males?

12      A     Yes, sir.

13      Q     So, it would be one tasering of each was enough to

14   get their attention, I assume?

15      A     Yes, sir.  Well, the first time, yes, I got a

16   good -- I actually got a connection.  The second time I did

17   not get a connection on that person.  And if you don't get a

18   connection, then sometimes it doesn't work properly.  And in

19   that case, the second time it didn't work.

20      Q     So, the second person, was that the person that

21   drew the gun?

22      A     No; that was the person -- well, he didn't

23   actually draw a gun.  He said he was going to shoot us.  We

24   ended up having to fight with him, yes, sir.

25      Q     The taser gun actually sends out, I guess, metal
```

1   tips that are on the end of the wires?

2        A    Uh-huh (yes), prongs; yes, sir.  They're called

3   prongs.

4        Q    Prongs?

5        A    Yes, sir.

6        Q    And those prongs, do they embed in the person's

7   skin or muscle tissue?

8        A    I won't say embed.  I'll say they make a

9   connection to their body, but --

10       Q    Do they stay there when they hit the person?

11       A    They stick, but they don't go in very far.  They

12   just barely will go into a person's skin.

13       Q    Will the leads penetrate clothing, for example?

14       A    It can, but if the person's clothing is baggy,

15   it's going to be difficult.

16       Q    How do you remove the leads?

17       A    You have to actually stick your hand in the

18   general area and just pull it out, and they come right out.

19       Q    The tasering process has a protocol to it; is that

20   correct?

21       A    Uh-huh (yes).  What are -- I'm sorry; I don't know

22   what you're --

23       Q    There's instructions and guidelines laid out in

24   the tasering process; am I correct?

25       A    Yes, sir.

```
 1      Q     Why don't you just run through that for us.
 2      A     Well, I don't know them.  I'm sorry.
 3      Q     Well, what do you do when you taser someone?
 4   You've done it twice.
 5      A     Yes, sir.
 6      Q     How do you give notice, for example?
 7      A     You do let other people around know that you are
 8   deploying your taser.  You do let the person know that they
 9   are going to be tased, to try to gain compliance.  If it's
10   not -- if the person is not compliant and you have to deploy
11   your taser, you let the person around you know.
12      Q     Once you pull your taser gun, what do you say,
13   "Taser-taser"?
14      A     Yes, sir.
15      Q     How many times do you say that?
16      A     There's no number of times, but if you say -- most
17   people say, "Taser-taser," but there's no set number of
18   times to say, "Taser."
19      Q     After you or the officer says, "Taser-taser," are
20   you beyond the point of no return; and by that, are you
21   definitely going to taser the person, or does the person
22   whom you're fixing to taser have an opportunity to cease and
23   desist whatever they're doing to avoid being tasered?
24      A     Well, I think -- my opinion is, I think a person
25   has the option to do that before it's even deployed; but if
```

```
 1    it gets to that point and -- I've been in situations where a
 2    taser has been deployed and the officer just didn't tell --
 3    say, "Taser-taser," and they have been deployed before.  So,
 4    I mean, it's that officer's judgment.
 5         Q    As to whether or not to go ahead and do the taser?
 6         A    Yes, sir.
 7         Q    Well, let me ask you what is your procedure, and
 8    you can make reference to the two times you've used the
 9    taser gun?  What is your procedure once you draw the taser
10    gun?
11         A    Well, in the situation I had, I could have used
12    deadly force and used a less lethal force.  He had a knife,
13    and I took a chance by deploying a taser.  The second time,
14    we had to fight with him, and like I say it's -- officers
15    can get injured in fights, and, you know, it's one of those
16    things where, like I said, we didn't have a choice.
17         Q    The protocol for tasering someone, that you
18    learned at the Academy, does it give the officer discretion
19    as to whether or not to go ahead, once they pull the taser
20    gun, not to taser, or do they have to follow-through with
21    the tasering?
22         A    No, you don't have to, I mean; but if the
23    situation -- it depends on the situation, I guess, and it's
24    that officer's judgment at that point.
25         Q    You know Mrs. Monts?
```

```
1        A       Yes.

2        Q       Before the tasering episode of --

3        A       Uh-huh (yes); yes, sir.

4        Q       -- on or about July 27, 2012, did you know her

5    before that?

6        A       Yes, sir.

7        Q       Tell us how you first came to know her.

8        A       I had dealt with her a couple times.  I went to a

9    couple calls to her house, also her daughter as well.  We

10   had an incident where she was involved in a fight at Weeks

11   Trailer Park, and they brought them down for a fight that

12   occurred one day.

13       Q       That's Mrs. Monts?

14       A       Yes, sir; her and her daughter.

15       Q       Now, was that before the incident that involved

16   the taser?

17       A       Yes, sir; yes, sir.

18       Q       Well, tell us a little about that incident with

19   her and her daughter.

20       A       Well, they were in the middle of an area of Weeks

21   Trailer Park and they were -- they got into it with someone

22   else and went over there to fight them.  They were doing

23   push-ups before the fight and stretching and all kind of

24   stuff and ended up getting into some kind of brawl, where

25   they were arrested.
```

 1      Q    The ladies were doing push-ups and stretching?

 2      A    Mrs. Monts was, yeah.

 3      Q    Did she say what she was going to do?

 4      A    I don't know.  They were just arrested for

 5  fighting, yes, sir.

 6      Q    So, she was actually arrested during that

 7  incident?

 8      A    Uh-huh (yes); for disorderly conduct.

 9      Q    Did you have to use force on her at that time?

10      A    No, sir.  I was actually -- we were doing the

11  shift change and they brought them in, and we did the

12  processing.

13      Q    You were just processing her?

14      A    Yes, sir.  I was present when they came in and I

15  didn't actually do the processing, but I was present, from

16  the incident.  I do have knowledge of that incident and

17  there have been a couple other ones, but --

18      Q    Well, you were not involved in the arrest of

19  Mrs. Monts --

20      A    No, sir; no, sir.

21      Q    -- at that time?

22      A    No.

23      Q    There's been another incident, I think you said,

24  involving Mrs. Monts --

25      A    Uh-huh (yes).

1       Q    -- with the Americus P.D.?

2       A    Uh-huh (yes).  I've been over to her house before.

3   I think her son's phone got stolen, and I had dealt with her

4   daughter before, too, as well.

5       Q    You say her son's phone got stolen?

6       A    Uh-huh (yes).

7       Q    Was Mrs. Monts the suspect --

8       A    No; no; no.

9       Q    -- or was she just there?

10      A    She was just present.

11      Q    So, you were not there because of anything she had

12  done?

13      A    No, sir.

14      Q    That's the second time you had seen her --

15      A    Uh-huh (yes).

16      Q    -- is that correct?

17      A    No; I know I've been over there a couple times.  I

18  just don't remember the calls.

19      Q    Well, you've told us about two times --

20      A    Uh-huh (yes).

21      Q    -- that you've seen Mrs. Monts or --

22      A    That I can recall, yes, sir --

23      Q    Yes, sir.

24      A    -- but it's more than that.  You know, I just

25  can't recall the number of times.

23

    1       Q    So, those are the only two times you can recall
    2   seeing her around Americus, other than around July the 27th
    3   of 2012?
    4       A    No, sir.  I've seen her other times, dealt with
    5   her other times; I just don't recall the incidents.
    6       Q    Okay; all right.  Did the other occasions that you
    7   dealt with Mrs. Monts involve having to arrest her?
    8       A    No; just talking to her and kind of talking her
    9   down before.
   10       Q    Okay.  Well, why don't you tell us about her
   11   demeanor when you have had occasion to be around her, for
   12   whatever reason.
   13       A    Usually intoxicated in each time I've dealt with
   14   her; but, you know, you just have to kind of talk to her a
   15   little bit and deal with her.  Basically, I've been patient
   16   with her.
   17       Q    How does she act or how did she act on the
   18   occasions that you've came into contact with her?
   19       A    I mean, a couple times, fine, and a couple of
   20   times -- and then once or twice maybe kind of belligerent,
   21   but --
   22       Q    Has she been intoxicated every time that you've
   23   had contact with her?
   24       A    Pretty much, yes.
   25       Q    What would the protocol on tasering someone state

                                  24

```
 1   about intoxication?
 2        A    I don't think there's anything about that.
 3        Q    Is there any prohibition against tasering someone
 4   that is intoxicated?
 5        A    No.
 6        Q    Is there any risk in the tasering effect being
 7   more severe of someone that's intoxicated, based upon what
 8   you have learned?
 9        A    No.
10        Q    Tell us about July the 27th, 2012, the incident
11   that is the basis of the lawsuit.
12        A    Okay.  Officer Ambos called for assistance.  He
13   didn't say what the problem was.  He just had called for
14   assistance, and I pulled up.  When I got there -- I sped up
15   to get to him, because it just sounded like there was
16   something going on.  And when I got --
17        Q    Okay.  Now, let me stop you.
18        A    Yes, sir.
19        Q    Why don't you tell us what time of day or night it
20   was and where the location was.
21        A    Okay.  One o'clock on McGarrah Street.
22        Q    p.m. or a.m.
23        A    1:00 a.m., yes, sir.
24        Q    In the middle of the night?
25        A    Yes; 1:00 in the morning.
```

```
 1      Q    It was dark?

 2      A    Yes, sir.

 3      Q    All right.  Well, you got the call from Officer

 4  Ambos?

 5      A    Uh-huh (yes).

 6      Q    Yes or no?

 7      A    Yes, sir.

 8      Q    And you responded as back-up; is that correct?

 9      A    Yes.

10      Q    Well, tell us what you observed.

11      A    Well, when I got there, I asked him what was going

12  on, and he said he was on a traffic stop.  He had to stop

13  the traffic -- he had to stop dealing with the traffic stop

14  he was on because there was a commotion.  Mrs. Monts and her

15  husband were walking down the street and caused some type of

16  commotion.  When I got there, she was still being loud and

17  belligerent.  I tried talking to her and calming her down.

18  I was able to kind of get her calmed down, and I went back

19  to my patrol car.  We were getting ready to leave.  She said

20  something and continued being loud and walking towards a

21  residential area, and that's what made me make contact with

22  her again.

23      Q    So, as I understand it, after you responded to

24  Officer Ambos's call for assistance --

25      A    Uh-huh (yes).
```

1       Q     -- you arrived there, and he was present already

2   with Mrs. Monts and her husband?

3       A     Uh-huh (yes).

4       Q     Yes or no?

5       A     Yes, sir.

6       Q     Was anybody else around?

7       A     There was a vehicle that was stopped with Officer

8   Ambos, but they ended up driving off.

9       Q     Was there anybody else, other than the occupants

10  of that vehicle that drove off?

11      A     No.

12      Q     Was this in a residential area?

13      A     Yes, sir.

14      Q     Anybody in the nearby houses come out and look at

15  the commotion?

16      A     No, sir.

17      Q     You didn't observe anybody come out?

18      A     I didn't -- if they did, I didn't see them.

19      Q     Okay.  Now, when there's more than one officer on

20  the scene, who's in charge, if you're both of equal rank?

21      A     Either officer can take control of a call at any

22  point.

23      Q     What was Officer Ambos's rank at that particular

24  time?

25      A     Patrolman.

1       Q       The same as you?

2       A       Yes, sir.

3       Q       And he got there first?

4       A       Yes, sir.

5       Q       And you backed him up?

6       A       Uh-huh (yes).

7       Q       Yes?

8       A       Yes, sir.

9       Q       The term "primary officer on the scene," does that

10      ring a bell?  Am I using correct terminology?

11      A       Yes, sir; but I don't agree with that always,

12      because if some officer -- one officer is not able to do

13      something, another officer may have to step in and do it at

14      some point.

15      Q       Well, give me an example when that would happen.

16      A       Okay.  Well, this situation, we were dealing with

17      a domestic, and I was talking to Mr. Monts.  Officer Ambos

18      was trying to talk to Mrs. Monts, but he was having a

19      problem doing so, at which point I stepped in and started

20      talking to her.

21      Q       Did you observe Mr. Monts and Mrs. Monts in any

22      kind of physical altercation?

23      A       Well, he had them separated when I got there, but

24      she was still being loud.  I talked to Mr. Monts, and I

25      can't remember what he told me what they were arguing about.

1    Q    Did you ever observe them actually physically

2  fighting each other, Mr. and Mrs. Monts?

3    A    Not when I got there.  They were in a verbal

4  altercation is what -- Officer Ambos said it was that bad,

5  to where he needed assistance.

6    Q    Well, you've had experience with Mrs. Monts

7  before --

8    A    Uh-huh (yes).

9    Q    -- according to your testimony?

10    A    Yes, sir.

11    Q    And you have stated that she gets loud --

12    A    Uh-huh (yes).

13    Q    -- from time to time?

14    A    Uh-huh (yes); and intoxicated.

15    Q    And intoxicated?

16    A    And she was that night as well.

17    Q    Did you smell alcohol on her?

18    A    Yes, sir.

19    Q    Did you smell alcohol on Mr. Monts?

20    A    Yes, sir.

21    Q    And so you initially approached Mr. Monts when you

22  got on the scene?

23    A    Well, separated them, because Officer Ambos was

24  talking to Mrs. Monts, so I separated him, Mr. Monts, from

25  her and started talking to him, "Hey, come over here and

1    talk to me for a second," which is what you do in a

2    domestic.  You try to separate the people and kind of figure

3    out what's going on.

4         Q    How close to Mrs. Monts was Mr. Monts when you

5    arrived on the scene?

6         A    They were a good distance away when -- well,

7    actually, they were right beside Officer Ambos when I first

8    got there.  He was in front of them, and I brought him back

9    to where I was, and we stepped away a good distance.

10        Q    Now, Officer Ambos had his patrol car there?

11        A    Yes, sir.

12        Q    And did you pull in front or behind his car?

13        A    Behind him.

14        Q    So, the lead car was Officer Ambos's vehicle?

15        A    Yes, sir.

16        Q    Yours was the one behind it?

17        A    Yes, sir.

18        Q    And did you have video cameras in your car?

19        A    Yes, sir; but I didn't turn on my blue lights.

20   So, if you don't turn on your blue lights, your body mic is

21   not going to come on.

22        Q    Did you have any kind of video operating at the

23   time that you got out of the car involving this incident?

24        A    I think I may have.  I might have turned my blue

25   lights on.  I don't remember.

1      Q     Are you saying that you would have had to turn

2   your blue lights on in order to activate the cameras on the

3   vehicle?

4      A     Unless I tap my button, and I think -- and if I'm

5   not mistaken, I had problems with my body mic before,

6   because I got it sent off and never had got it back.

7      Q     Do you know whether or not your cameras on your

8   patrol car were on at any time that night during this

9   incident?

10     A     I believe they were, but I wouldn't have had audio

11  because my body mic, there was a problem with it.

12     Q     So, you arrived on the scene, and then proceeded

13  to separate Mr. Monts from Mrs. Monts --

14     A     Uh-huh (yes).

15     Q     -- correct?

16     A     Yes, sir.

17     Q     And you talked to Mr. Monts?

18     A     Uh-huh (yes).

19     Q     Yes or no?

20     A     Yes, sir.

21     Q     And Officer Ambos talked to Mrs. Monts?

22     A     Yes, sir.

23     Q     Now, I'm going to ask you again, at that point in

24  time, who was the primary officer at the scene, you or

25  Officer Ambos?

 1      A    Officer Ambos.

 2      Q    And by the term primary officer, what do I mean?

 3 What is the meaning of that term?

 4      A    The first officer on the scene.

 5      Q    Does that officer have any more authority over the

 6 situation than the other arriving officers?

 7      A    No.

 8      Q    Would you have had equal authority to take

 9 whatever action you deemed necessary, just like Officer

10 Ambos would have?

11      A    Yes.

12      Q    You'd have had the same equal authority that he

13 had at that scene?

14      A    Yes, sir.

15      Q    Tell me what you talked to Mr. Monts about.

16      A    I don't remember, just general of what was going

17 on, but I don't remember what he told me.

18      Q    How was his demeanor towards you?

19      A    He calmed down after I talked to him for a little

20 bit, and I tried to explain to them that it would be best

21 for them to go home due to the time of the morning.

22      Q    And his response?

23      A    He seemed like he was okay with that.  And Officer

24 Ambos was still dealing with Mrs. Monts, so I stepped away

25 from him and went over to her and tried talking to her, to

1    calm her down.

2         Q     You left Mr. Monts standing by himself?

3         A     Yeah.

4         Q     And about how far from Mrs. Monts and you and

5    Officer Ambos was he at that time?

6         A     I don't remember the amount of feet; but, I mean,

7    he was a good distance away.

8         Q     Ten or 15 feet?

9         A     I don't remember.  I don't think it was maybe -- I

10   guess 20 feet maybe.  I don't know.  I don't remember.

11        Q     Did anybody else come up at this point in time,

12   neighbors or gawkers, other law enforcement?

13        A     No.

14        Q     Any cars pass during this part of the incident?

15        A     I remember the vehicle that Officer Ambos stopped,

16   they drove back by, but they went on again.  I think they

17   were just seeing what was going on.

18        Q     They didn't stop?

19        A     No; they just kind of creeped on by and drove off.

20        Q     Did you recognize them?

21        A     I recognized that vehicle.

22        Q     And do you know to whom it belonged?

23        A     No.

24        Q     Did you get the tag number?

25        A     No.

1    Q    Did they, the occupants of that vehicle, say

2    anything the second time they came by?

3    A    No.

4    Q    How many people were in that car?

5    A    I don't remember.

6    Q    Well, you and Officer Ambos are talking to

7    Mrs. Monts, and Mr. Monts is standing some 20 feet away or

8    approximately 20 feet away at that time by himself; is that

9    correct?

10   A    Yes, sir.

11   Q    Tell us what happened.

12   A    I'm not sure how we told them that they could

13   leave.  I think we told them that they could leave; but just

14   as they were leaving, she was still -- Mrs. Monts was still

15   continuing to be loud.  Mr. Monts was calm.  She was being

16   loud, and that's when -- you know, I had my windows down,

17   and she said something.  And she kept walking off, being

18   loud.  And I exited my patrol car and asked her to step over

19   and talk to me, you know, and I was going to try to talk to

20   her and tell her just calm down, you know, "You're going

21   into a residential area."

22   Q    Okay.  Let me stop you there and ask you this.

23   A    Okay.

24   Q    So, as I understand it, Mr. and Mrs. Monts seemed

25   to be willing to comply with your suggestion that they go on

1    home --

2         A    Uh-huh (yes).

3         Q    -- correct?

4         A    Yes.

5         Q    And at that point in time, they were free to go.

6    Am I correct on that as well?

7         A    Yes, sir.

8         Q    And you proceeded to go to your patrol car, and

9    you actually got inside your patrol car.  Am I right on

10   that?

11        A    Yes, sir.

12        Q    And Officer Ambos, what did he do at that point in

13   time?

14        A    I'm not sure what he did; but my windows were

15   down, and I could hear her continuing to be very loud.

16        Q    Yes, sir.  Now, Officer Ambos's vehicle, patrol

17   car, was in front of yours --

18        A    Yes, sir.

19        Q    -- am I correct?

20        A    Yes, sir.

21        Q    So, you would have been facing towards his

22   vehicle?

23        A    Yes, sir.

24        Q    Did you see Officer Ambos anywhere in your field

25   of vision after you got inside your patrol car?

1      A    I didn't see what he was doing inside his patrol
2  car.  I didn't see him put it in drive or anything like
3  that.
4      Q    But was he inside his patrol car at that point in
5  time?
6      A    I think he was either getting in it or was in it.
7  I don't remember.
8      Q    And your windows were down in your patrol car?
9      A    Yes, sir.
10     Q    And as Mr. and Mrs. Monts went on down the
11 highway, were they on the passenger's side of your patrol
12 car --
13     A    Yes, sir.
14     Q    -- headed toward the rear of your patrol car?
15     A    Yes, sir.
16     Q    And you were looking in the opposite direction,
17 toward Officer Ambos's patrol car at that time; is that
18 correct?
19     A    Yes, sir; until I started hearing the commotion,
20 and that caught my attention the second time.  She had
21 actually said something, but I ignored that.  I ignored it,
22 but she started being loud, and that's what made me get out
23 of my car.
24     Q    Well, she never stuck her head in your car and
25 said anything to you, did she?

1      A      No.  She said something to me as I was getting

2   into my patrol vehicle, I think.  I don't remember, though.

3      Q      Yes, sir.  But she never touched your patrol

4   car --

5      A      No.

6      Q      -- did she?

7      A      No.

8      Q      And so she proceeded on toward the direction of

9   the opposite way in which your patrol car was facing?

10     A      Yes, sir; and she was being very loud.

11     Q      Very loud?

12     A      Yes, sir.

13     Q      Do you recall what she said?

14     A      I can't remember.  I do recall she did tell me to

15  leave her alone and go fuck with some white folks.

16     Q      And is that the point at which you got out of your

17  patrol car?

18     A      I ignored what she said.  She started being loud

19  and continuing to be loud, and that's what made me step out

20  of my patrol car.

21     Q      But is it not true that she continued walking away

22  during the entire time?

23     A      Into a residential area, yes, sir.

24     Q      Yes, sir.  How far was the closest house?

25     A      There's actually a corner house right there, and

```
 1    there's several other houses, and there's actually a trailer
 2    also that someone lives in and some apartments right there,
 3    which there's five, so the closest house was in very close
 4    proximity.
 5         Q    How far?
 6         A    Maybe 20 feet, 30 feet.
 7         Q    Now, at any time did you see the occupants of any
 8    of the houses or that trailer come out on the front porch or
 9    in the yard or outside of the house or trailer at any time?
10         A    No, I don't know if they did or didn't.
11         Q    No.  I'm asking did you see them?
12         A    No, I didn't see anyone.
13         Q    So, Mrs. Monts and her husband are walking away?
14         A    Uh-huh (yes).
15         Q    And she continues to be loud?
16         A    Yes, sir.
17         Q    And after saying what you've just said about you
18    leaving her alone and going and bothering white folks --
19         A    Uh-huh (yes).
20         Q    -- she continued walking away; is that correct?
21         A    No -- yes, sir.
22         Q    And you were still in your patrol car at that
23    point in time?
24         A    Yes, sir.
25         Q    Well, now, what is it that was said or done that
```

1    caused you to get out the second time?

2         A    Just the continuously being loud.  She's still

3    breaching the peace, and the thing is we already had one

4    situation; we didn't need another one while we were still

5    present.

6         Q    Well, what was different about her walking away

7    than when you first got there?

8         A    Well, she was still being loud.

9         Q    She was loud when you got there, I assume.

10        A    Yeah.  And we did calm her down, but she started

11   back up, and like I say, it continued.  And sometimes, to

12   avoid the problem -- you don't want to continue to have to

13   keep dealing with the same problem.  That's what we were

14   trying to avoid.  That's what I was trying to avoid.

15        Q    But you didn't see anyone come out of the

16   dwellings in the immediate vicinity and look to see what was

17   going on, did you?

18        A    Well, I didn't -- I don't -- no, sir, I didn't see

19   anyone.

20        Q    But you didn't see anyone, did you?

21        A    No.

22        Q    And at that point in time, there was no other

23   traffic coming down the road --

24        A    Well --

25        Q    -- was there?

```
 1       A    -- no, but I think that's kind of irrelevant,
 2  because still, just because people aren't outside doesn't
 3  mean they're not being disturbed.  It might wake somebody
 4  up.  There is a potential for that problem, and I just
 5  prevented it before it happened.
 6       Q    But she was just as loud when you got there as she
 7  was when you --
 8       A    No, sir; she calmed down.
 9       Q    -- got out of your patrol car?
10       A    She did calm down, and she started back up.
11       Q    I understand that.  But when you initially got
12  there, she was loud, wasn't she?
13       A    Yes, sir.
14       Q    She was just as loud when you initially got there
15  as she was when you got out of the patrol car the second
16  time.  Isn't that true?
17       A    Well, she started back up, yes, sir.
18       Q    I understand.  But when she started back up, she
19  was loud?
20       A    Yes, sir.
21       Q    When you first got there, she was loud?
22       A    Yes; but we calmed her down.
23       Q    You calmed her down?
24       A    Uh-huh (yes).
25       Q    So, did she tell you where she had been up until
```

1    the point where you and Officer Ambos came upon them?

2        A    I recall something about $5 being taken from her.

3    I don't know.  It was something, I guess, involving a family

4    member.  Her daughter did show up at the emergency room and

5    had said that her mother assaulted her that same night, but

6    that was after, you know, we had dealt with her.

7        Q    Well, did you get any information that would

8    indicate to you or tell you where she had been before y'all

9    found her?

10       A    I don't know where they were coming from.  I just

11   know they were upset about $5.  I don't know where they

12   exactly came from.  That's what started this whole mess, I

13   guess.

14       Q    Now, the side of the road on which Mrs. Monts and

15   Mr. Monts were walking, were there any houses on that side

16   of the road in the immediate vicinity?

17       A    No.  Across the street, there are, and then when

18   you come to that corner, there's houses right there.

19       Q    On the same side or the other side of the street?

20       A    On the other side, and then on Mitchell Street

21   there's houses close to that proximity as well.

22       Q    But the immediate area surrounding where you came

23   upon Mrs. Monts, Mr. Monts, and Officer Ambos was

24   essentially vacant lots; am I correct?

25       A    No, sir; there's a business right there.  But

41

```
 1   directly across the street from the business, there's about
 2   five apartments right there.
 3        Q    What's the name of the business?
 4        A    I couldn't tell you.
 5        Q    What's the name of the apartments?
 6        A    Park -- what is it, Parkview Place Apartments.
 7        Q    Were there any lights on in the business?
 8        A    That business is closed, so I don't think there
 9   are.
10        Q    Any lights on over at the apartment complex, that
11   you noticed?
12        A    I wasn't paying attention to that, sir.
13        Q    So, the truth of the matter is, there's no
14   evidence that you could see of anybody, whether it be at the
15   apartments or the surrounding houses or that trailer, but of
16   anybody being disturbed?
17        A    Well, you still --
18             MR. McWILLIAMS:  Object to the form of the
19        question.
20             MR. LEDFORD:  Okay.  Let me rephrase that.
21        Q    (By Mr. Ledford)  Did you see any evidence that
22   anyone in the immediate vicinity was disturbed by
23   Mrs. Monts' loud tone?
24        A    Well, I wasn't --
25        Q    Yes or no, and then you may explain.
```

```
 1      A     Okay.  No.

 2      Q     You may explain.

 3      A     But Officer Ambos felt that there was some sort of

 4   problem that he had to step in and get involved in the

 5   situation that they created.

 6      Q     That was the initial reason --

 7      A     Yes, sir.

 8      Q     -- for him getting involved?

 9      A     Yes, sir.  And we don't -- just because other

10   people aren't out, you look at the time of the morning, you

11   look at the potential for the problem, and there was a

12   potential for that problem to continue, based on their

13   demeanor, based on their intoxication.  So, there was still

14   a potential for that problem to continue.

15      Q     Well, the truth of the matter is--you've already

16   answered it--you didn't see any evidence during this

17   incident of anybody being disturbed?

18      A     Well, yes, sir.

19      Q     Who?

20      A     Officer Ambos.

21      Q     Other than you and Officer Ambos, other than

22   Mrs. Monts and Mr. Monts, there was no evidence of anybody

23   else being disturbed in that immediate vicinity, was there?

24      A     Well, sir, I didn't -- I wasn't paying attention

25   to the houses around.  My concern is not the surrounding;
```

```
 1   it's what's going on at that time.
 2        Q    Well, you've talked about the surrounding, though,
 3   so let's -- you can't have it both ways here.  Let's get to
 4   the surrounding --
 5        A    Okay.
 6        Q    -- and you'll need to answer yes or no --
 7        A    Okay.
 8        Q    -- and then you may explain.
 9        A    Okay.
10        Q    The truth of the matter is, other than you and
11   Officer Ambos --
12        A    Uh-huh (yes).
13        Q    -- other than Mrs. Monts and Mr. Monts, you didn't
14   see any evidence of anybody else in the vicinity that was
15   disturbed by this incident, did you?
16        A    Well, sir, I can't speak on what those people --
17   you know what I'm saying?
18        Q    I'm asking what you saw and observed; yes or no?
19        A    I was -- no.
20             MR. McWILLIAMS:  I object to the form of the
21        question.  It's asked and answered three times.
22        Q    (By Mr. Ledford)  Now, tell us what happened after
23   you got out of your patrol car.
24        A    Which time?
25        Q    The second time.
```

1      A      The second time.  I asked her to come over to me

2   and was telling her, "Look, I need to talk to you.  You need

3   to calm down because you're being loud," and she decided to

4   run off.

5      Q      Now, was it your intention to arrest her when you

6   got out of the patrol car --

7      A      No.

8      Q      -- the second time?

9      A      No, not at all.

10      Q      You approached her, and she ran off?

11      A      Yeah.

12      Q      And what did Mr. Monts do?

13      A      Mr. Monts?  I don't remember what he did exactly,

14   because my focus was on her at that point; but at that point

15   when she ran off, she was going to be placed under arrest,

16   because we were done dealing with the situation.

17      Q      How did you or Officer Ambos release Mr. and

18   Mrs. Monts as they began to walk off?  Was it you or Officer

19   Ambos?

20      A      I don't remember what point they were released.  I

21   don't remember.

22      Q      How was that done?  Was it verbally, such as,

23   "You're free to go; go on home," or how was it done?

24      A      I don't remember.

25      Q      But the truth of the matter was, they were free to

```
 1   go at some point in time --
 2        A    But they --
 3        Q    -- before you got out of the patrol car --
 4        A    Yes, sir.
 5        Q    -- the second time?
 6        A    When the -- the second time when I got out, at
 7   that point, that was -- it was -- you know, the freedom was
 8   over with, because it was the point where we needed to talk
 9   to her again.  So, we had a right, at that point, to talk to
10   her again, because of her behavior and the breach of the
11   peace.
12        Q    Well, you say she ran?
13        A    Uh-huh (yes).
14        Q    Yes or no?
15        A    Yes.
16        Q    Which way did she run?
17        A    She ran down the street, towards Mitchell Street,
18   into the residential area.
19        Q    Would that be away from the rear --
20        A    Away from the patrol car, yes, sir.
21        Q    From the rear of your patrol car?
22        A    Yes.
23        Q    And where was Officer Ambos at this point in time?
24        A    I don't remember if he got out of his car, but he
25   came down there when he realized there was a disturbance
```

```
 1   going on.
 2        Q    When's the first time you noticed him reappear?
 3        A    When I told her she was under arrest.
 4        Q    And where was she at that point?
 5        A    She was standing directly in front of me, because
 6   I had to run her down and run in front of her and stop her.
 7        Q    So, you had already chased her down --
 8        A    Uh-huh (yes).
 9        Q    -- at this point in time?
10        A    Yes.
11        Q    And how far away are you from Mr. Monts at that
12   point?
13        A    He was right there.
14        Q    Was he running with y'all?
15        A    No.
16        Q    Well, as she walked away, he and she were
17   together --
18        A    Yeah.
19        Q    -- am I correct?
20        A    Yeah.
21        Q    And they were in close proximity to your patrol
22   car; is that correct?
23        A    Uh-huh (yes).
24        Q    Yes or no?
25        A    Yes.
```

```
 1      Q    And they were more to the rear of your patrol car;
 2  is that also correct?
 3      A    Yes.
 4      Q    Both you and Officer Ambos were in your respective
 5  patrol cars at that point?
 6      A    Yes.
 7      Q    And you got out --
 8      A    I think I was getting in.  I don't really remember
 9  if I was -- I know my windows were down.  I guess I was
10  getting in.  I don't remember.
11      Q    Well, anyway, you then re-emerged or left your
12  patrol car and told Mrs. Monts to come to you --
13      A    Yes.
14      Q    -- is that what you're saying?
15      A    Yes.
16      Q    And then you said she ran?
17      A    Uh-huh (yes).
18      Q    Yes or no?
19      A    Yes.
20      Q    Are you sure?
21      A    Yes.
22      Q    And how far did she run?
23      A    Not very far.
24      Q    Give me an estimate.
25      A    Maybe 20 yards, not even 20 yards; maybe 15 yards,
```

```
 1    I guess, 10 yards.

 2        Q    Ten or 15 yards?

 3        A    Yeah.

 4        Q    That would be 30 or 45 feet?

 5        A    Yeah.

 6        Q    And that would be from your patrol car?

 7        A    Yes.

 8        Q    You chased her that far?

 9        A    Yes.

10        Q    And when you caught her, Mr. Monts was right

11   beside you?

12        A    I don't know if walked -- I believe he walked up.

13   I can't remember.  I don't know.

14        Q    And then in relation to all of this, when did you

15   next see Officer Ambos?

16        A    When I told her she was under arrest.

17        Q    And how far was that -- well, let me rephrase it.

18   Was that approximately 10 to 15 yards from your patrol car?

19        A    A little further, I believe.

20        Q    That's where you caught her after she ran?

21        A    Uh-huh (yes).

22        Q    Yes or no?

23        A    Yes.

24        Q    So, it's you and her, and Mr. Monts comes up and

25   then Officer Ambos comes up.  Is that the sequence of
```

1    events?

2         A    I don't remember, but -- I don't remember.

3         Q    Well, anyway, at some point in time, the four of

4    y'all were back again together.  Is that true?

5         A    Yes.

6         Q    Well, tell us what happened.

7         A    I told her she was under arrest, and I remember

8    her violently snatching away from me, at which point when I

9    tried to grab her, we lost our balance.  She fell.  I

10   stumbled back, because we were on a hill, and that's when I

11   tried to actually effect the arrest.  Mr. Monts kept trying

12   to intervene, and I remember Officer Ambos taking his taser

13   out; and if I'm not mistaken, he pointed it at Mr. Monts and

14   told him to get back.  And I continued to try to place her

15   under arrest, and she was physically and actively resisting.

16   I heard Officer Ambos say, "Taser," at which point I backed

17   away, and he deployed his taser.

18        Q    And when an officer says, "Taser," that means they

19   are contemplating or they're fixing to shoot --

20        A    Yes, sir.

21        Q    -- the taser gun?

22        A    From my experience, if you say, "Taser," I'm --

23   and I see it pointed in that direction, I'm getting out of

24   the way.

25        Q    Well, up until the point when you got out of your

1   patrol car the second time or left it the second time,

2   Mrs. Monts and her husband, Mr. Monts, were free to leave.

3   Is that true?

4        A     Yes, sir; until you heard the commotion from her.

5   That's when I had to get back out.  I had to get my --

6   intervene again and talk to her again.

7        Q     Let me ask you this.  Did you at any time ever

8   pull your taser gun?

9        A     No.

10       Q     Did you at any time ever pull your service

11  revolver or your weapon?

12       A     No.

13       Q     Was a gun ever pulled on Mr. Monts?

14       A     No.

15       Q     Was he ever tasered?

16       A     No.

17       Q     Did he comply with your or Officer Ambos's request

18  to back up?

19       A     No; because he kept trying to get involved.

20       Q     Why didn't you taser him, or why didn't -- why

21  wasn't he arrested?

22       A     I was dealing with her, and Officer Ambos was

23  trying to deal with the situation as well.  I guess he felt

24  that the more immediate threat was her being on the ground,

25  resisting arrest, with me on the ground as well.

1      Q    Who was she a threat to?

2      A    Myself.

3      Q    She had already been tasered; is that correct?

4      A    No, sir.

5      Q    So --

6      A    That's what led up to the taser being deployed;

7   because when I was trying to handcuff her, instead of her

8   placing her hands behind her back, she was on the ground,

9   tussling and rolling around on the ground, refusing to put

10  her hands behind her back.

11     Q    Okay.  Give me the sequence of events after you

12  place her under arrest.  Tell me what happened.

13     A    I told her she was under arrest.  And when I went

14  to get her arm and pulled my handcuffs out, she snatched

15  away, at which point when I grabbed her arm, I just remember

16  at some point we both -- if not one, both of us lost our

17  balance.  She fell down, at which time I tried to handcuff

18  her, and she actively began resisting arrest.  I did tell

19  her several times to put her hands behind her back, and I

20  recall Officer Ambos pulling his taser out when Mr. Monts

21  kept trying to get involved.  The taser was deployed.  And

22  when he said, "Taser," I backed away from her.

23     Q    As you sit here today, tell us how tall you are.

24     A    Five-eight.

25     Q    And what is your weight today?

52

```
1        A     Two, fifty-five.

2        Q     And on this day in question, I believe it was,

3    what, July the 27th of 2012 --

4        A     Uh-huh (yes).

5        Q     -- when Mrs. Monts was arrested?

6        A     Uh-huh (yes).

7        Q     Is that the date?

8        A     Yes, sir.

9        Q     What was your weight at that point in time?

10       A     About the same, maybe a little bit more.

11       Q     And approximately 260 or better --

12       A     Yes, sir.

13       Q     -- 260 pounds or better?

14       A     Yes.

15       Q     Now, as you look at Mrs. Monts, she doesn't appear

16   to be a very stout lady, does she?

17       A     Looks can be deceiving.

18       Q     Yes, sir; but I'm talking about her physical

19   makeup.  Her build is more of, would you say, a slight or --

20   a slight to medium build for a woman?

21       A     Yes.

22       Q     She never injured you in this incident, did she?

23             MR. McWILLIAMS:  Object to the form of the

24       question.

25       Q     (By Mr. Ledford)  Well, I'm going to ask you, did
```

1    she ever injure you in this -- during this altercation

2    between you and her?

3        A    No, sir; but it was some physical exhaustion, as

4    far as the length of time that this went on.  When a person

5    is resisting, I think you're putting out -- it takes more --

6    it's harder to restrain a person resisting, a man or a

7    woman.

8        Q    Well, you would acknowledge that at some point in

9    time, you would have been on top of Mrs. Monts during your

10   attempt to handcuff her; am I correct?

11       A    Yes, sir.

12       Q    And you would have been attempting to handcuff her

13   with her hands behind her back.  Is that also true?

14       A    Attempting to, but she had her hands underneath

15   her and I couldn't get them.

16       Q    Well, when she had her hands and you have said

17   underneath her --

18       A    Uh-huh (yes).

19       Q    -- you've indicated to the front of her body?

20       A    Yes, sir; underneath her, yes, sir.

21       Q    Also, she had her hands under her -- under the

22   opposite arms.  Is that where she was?

23       A    I don't remember if they were like that.  I

24   remember -- I know they were underneath her, but I know I

25   couldn't get them out.  I had a difficult time trying to get

```
 1    them.
 2         Q    Was she on the ground, face down, at this time?
 3         A    Yes, sir; and actively resisting.  I felt her
 4    tensing her body up as well to prevent me handcuffing her.
 5         Q    So, you were trying to pull her arms from
 6    underneath her --
 7         A    Yes, sir.
 8         Q    -- and get them to the back of her --
 9         A    Yes, sir.
10         Q    -- where you could place the handcuffs on her?
11         A    Yes, sir.
12         Q    And you were on top of her back or to the back
13    side of her; am I correct?
14         A    I believe I was on the side of her actually.  I
15    don't believe I was on top of her.
16         Q    Was there any point in time when you actually, for
17    whatever reason, was on top of her with her face down?
18         A    I don't remember.
19         Q    It's possible?
20         A    It is, yeah.
21         Q    She was tasered once?
22         A    Yes, sir.
23         Q    And what happened then?
24         A    I tried to get her hands behind her.  She
25    continued resisting and still rolling around on the
```

1    pavement.  And Mr. Monts was still trying to get involved,

2    and we're still telling him to get back, at which point a

3    second deploy -- the second time the taser was deployed,

4    which gave a second burst and it was a 5-second cycle, she

5    still continued to resist.  The third time -- he didn't

6    taser her a third time.  After the second time, I told him

7    to just stop, and I had to actually put more force and

8    actually handcuff her.  I had to just grab her hands, and I

9    recall grabbing them and able to get her handcuffed after we

10   struggled.

11        Q    She was still struggling --

12        A    Yes, sir.

13        Q    -- after the second taser?

14        A    Yes, sir.

15        Q    Just as strongly as she had initially been

16   struggling?

17        A    Yes, sir.

18        Q    She didn't get any weaker, did she?

19        A    No.

20        Q    But you were able to taser her after she -- I

21   mean, to handcuff her after she had been tasered the second

22   time; is that correct?

23        A    Yes, sir.  It took -- she still struggled, and it

24   took a few, but I told him just, "I've got it," you know.

25   So, I had to --

1        Q      Did you make a report on this?

2        A      Yes.

3        Q      And were you interviewed by Internal Affairs?

4        A      Yes.

5        Q      And let me ask you this.  The truth of the matter

6    is that you have admitted that you placed her under arrest

7    just because she was mouthing off?

8               MR. McWILLIAMS:  Object to the form of the

9          question.

10       Q      (By Mr. Ledford)  Did you place her under arrest

11   because she was mouthing off?

12       A      No; I placed her under arrest because she broke

13   the law.

14       Q      How?

15       A      Disorderly conduct.  It's a breach of the peace.

16   And the first time she actually did it, we told her to go.

17   The second time I tried to talk to her, and like I say it

18   caused a bigger problem, so she was placed under arrest for

19   it.

20       Q      But she wasn't any louder the second time than she

21   was the first, was she?

22       A      But that's a discretion at that point.

23       Q      No; answer --

24       A      I tried to give her an opportunity --

25       Q      -- answer the question and you may explain.  Yes

 1   or no?

 2        A     Yes.  It was probably the same.

 3        Q     About the same?

 4        A     Yeah.

 5        Q     She was mouthing off about the same, about the

 6   same loudness --

 7        A     Uh-huh (yes).

 8        Q     -- when she was placed under arrest, as she was

 9   when she was let go.  That's true, isn't it?

10        A     Yes, sir; but we calmed the -- the thing is, the

11   first time, we calmed the situation down.  The second time,

12   she started back up.

13        Q     Have you ever told anyone that you placed her

14   under arrest just because she was mouthing off?

15        A     I don't remember telling anybody that.

16        Q     Are you saying that you did not, or are you just

17   saying you don't remember?

18        A     I don't remember telling anyone that.  Could you

19   tell me who I told that?

20        Q     I'll ask the questions.

21        A     Okay.

22        Q     The truth of the matter is, you have made the

23   statement during your interview or various interviews that

24   you probably could or should have let her go, walk away.

25              MR. McWILLIAMS:  Is there a question?

 1       Q    (By Mr. Ledford)   Have you, during any subsequent
 2  interview with anyone said words to the effect that you
 3  probably should have let her just walk away?
 4       A    I don't remember.
 5       Q    You're not denying that you said that, are you?
 6       A    I said I don't remember.
 7       Q    Yes, sir.  You don't remember, but you're not
 8  denying it either, are you?
 9       A    I don't remember, that's what I'm saying.  I don't
10  remember saying anything of those effects.
11       Q    Have you ever heard the terminology use of force?
12       A    Yes.
13       Q    When you deploy your service weapon, your sidearm,
14  when you pull it out, you have to do a report of use of
15  force, don't you?
16       A    Uh-huh (yes).
17       Q    I mean, that's protocol, isn't it?
18       A    Yes.
19       Q    If you'll answer yes or no for the court reporter,
20  it would help us.
21       A    Yes.
22       Q    So, when you pull a taser, there is supposed to be
23  a use of force report made; is that correct?
24       A    Yes.
25       Q    Now, I understand your testimony today is that

1    Officer Ambos pulled the taser.

2         A    Yes, sir.

3         Q    But is it not true that when you are involved in

4    an incident where you observe another officer pull a gun or

5    a taser or any other weapon, for whatever reason, that you,

6    as well, have to file a use of force report?

7         A    No, you don't.

8         Q    You're saying that's discretionary?

9         A    No, you don't have to.  If I'm the person using

10   force, then I'm the one that has to do the use of force

11   report.

12        Q    Have you ever pulled your gun or a taser on

13   anyone?

14        A    Yes.

15        Q    Did you do a -- did you file a use of force

16   report?

17        A    Yes; but there have been times when we haven't as

18   well.

19        Q    There have been times when you haven't?

20        A    Yes, sir.

21        Q    Tell us about those times.

22        A    If you're clearing a building out and checking the

23   area, you pull your gun out, you don't do a use of force for

24   that; which a lot of times when we go to burglaries or

25   checking vacant houses, things like that, you're not going

1   to do a use of force on that.

2        Q    Have there been times when you pulled your weapon

3   and there were people around?

4        A    Yes.

5        Q    Did you file a use of force report at that time?

6        A    Not every time, no.

7        Q    Why not?

8        A    Just because sometimes a supervisor may tell you

9   you don't need to do a use of force on that, it's not

10  necessary.

11       Q    But you're taught to do that in Police Academy,

12  are you not?

13       A    Use of force is really when you actually -- when

14  you use it, not when you pull it.  That's when a use of

15  force is.

16       Q    You're saying there's a distinction between

17  pulling a weapon of any kind and using it --

18       A    Yes.

19       Q    -- as far as having to do a use of force report?

20       A    Yes, sir.

21       Q    If you don't actually use your weapon, whether it

22  be your pistol --

23       A    Yes.

24       Q    -- your firearm or a taser, if you don't actually

25  use it, you don't have to file a use of force report.  Is

1    that your testimony?

2         A    No.  There was a misunderstanding, and we were

3    told you have to, which it's -- we've been told several

4    different things.  At one point it was you didn't have to;

5    now you have to.  Even if you pull your taser out of the

6    holster, you have to.  And at that time, we just had a

7    misunderstanding, because some officers weren't aware that's

8    what you had to do.  Every time that you do it, you have to

9    do a use of force report.

10        Q    Even if you are not the one to pull it, but if you

11   witness it?

12        A    No, not for that; no.

13        Q    Do you know if Officer Ambos filed a use of force

14   report --

15        A    Yes.

16        Q    -- for this evening?

17        A    He did.

18        Q    Do you know the definition of disorderly conduct?

19        A    Yes, sir.

20        Q    What is it?

21        A    It's acting in a violent or tumultuous manner,

22   breach of the peace, also creating a disturbance or a breach

23   of the peace.

24        Q    And you would acknowledge that in order to create

25   a disturbance of the peace, there's got to be someone to

1   disturb?

2       A    Yes -- no.  Two people arguing is actually

3   disorderly conduct and is a breach of the peace.

4       Q    Now, the argument that you say was going on

5   between Mr. Monts and Mrs. Monts, tell us about it.  What

6   was said?

7       A    I don't know.  I got there, and when I got there I

8   was separating them.  We were trying to diffuse the

9   situation.  I do know there was something about $5.  That's

10  all I can remember, there was something about $5 being taken

11  from somebody.

12      Q    Mrs. Monts was not accusing Mr. Monts of taking

13  the money, was she?

14      A    I think where they were at, they had a problem and

15  left, but I don't remember the whole effects.

16      Q    The argument was not between Mr. and Mrs. Monts

17  that evening, was it?

18      A    Well, I don't know who was arguing.  When I got

19  there, they were both being loud, so I was just trying to

20  diffuse the situation.

21      Q    Did they appear to be concerned about someone

22  having taken money from Mrs. Monts?

23      A    Well, I never did talk -- I never did get the

24  specifics of actually what happened.  We were just trying to

25  get them out of the area and diffuse the situation.

1      Q    You never heard Mrs. Monts accuse Mr. Monts of
2  taking the money, did you?
3      A    I don't remember.  I don't think it was -- I don't
4  think he was the one that took it.  It was wherever they
5  were at previously.
6      Q    Well, my question, though, is you never heard her
7  accuse him of take the money -- taking the money, did you?
8      A    No.
9      Q    So, would it not have been your impression that
10 the argument or the discussion, even though it was loud --
11     A    Uh-huh (yes).
12     Q    -- was not one of anger being directed toward each
13 other?
14     A    Well, I think her behavior upset him and caused
15 them to get into it.  Like I said, they were both drunk, and
16 they were both just being really loud, so --
17     Q    But you didn't see Mr. Monts do anything to
18 physically harm or try to physically harm Mrs. Monts, did
19 you?
20     A    I wasn't there before that, so I don't know.
21     Q    I'm asking you.  You didn't see it at any time?
22     A    Not when I got there, no.
23     Q    And you didn't see Mrs. Monts at any time try to
24 physically harm Mr. Monts, did you?
25     A    No.

```
 1        Q     And during this whole time, other than you and
 2   Officer Ambos and Mr. and Mrs. Monts and that car that came
 3   by --
 4        A     Uh-huh (yes).
 5        Q     -- and it came by the second time, you never saw
 6   another person out there until after Mrs. Monts was
 7   arrested.  That's true, isn't it?
 8        A     Yes.  But also -- never mind.
 9        Q     So, is it your testimony that you never told
10   Officer Monts -- I meant Officer Ambos to deploy his taser
11   gun?
12        A     I know I heard the video and I did tell him, but
13   that's his choice.  That would be the same scenario if he
14   was holding a gun and he had decided, it's his discretion to
15   do it at that point.  I'm not in any position to give
16   orders.  If an officer deems that they need to --
17        Q     So, then the truth of the matter is, you did tell
18   him to use his taser, didn't you?
19        A     Yeah; but also that's still his choice.  It would
20   be the same with anything.  If he took -- if he decided to
21   take his firearm out and decided -- and did and shot
22   someone, it would be the same scenario.  He's responsible
23   for his own actions.  He said he was going to tase her.  The
24   only thing I said was, "Go ahead," if that's what he's going
25   to have to do, just to prevent this altercation from going
```

1    further.  And sometimes that's used as a tactic to gain

2    compliance.  If a person -- if you tell a person you're

3    going to taser them, most of the time or a lot of times,

4    that will gain compliance from a competent person, yes.

5         Q    At that point in time when you said to Officer

6    Ambos, "Go ahead," you stepped back?

7         A    Yeah.

8         Q    Mrs. Monts was on the ground?

9         A    Uh-huh (yes).  I stepped out of the way.

10        Q    Mrs. Monts was on the ground at this time?

11        A    We were both on the ground.

12        Q    You stepped back when you heard --

13        A    I got up off the ground, yes.

14        Q    Let me ask the question.  You say Officer Ambos

15   said the word taser?

16        A    Uh-huh (yes).

17        Q    Yes or no?

18        A    Yes.

19        Q    Is that -- after that, did you say, "Go ahead;" or

20   did you say, "Go ahead," before he said, "Taser"?

21        A    I don't remember.

22        Q    But at some point in time, you stepped back?

23        A    Yeah; when he said, "Taser-taser."

24        Q    That means you got up off the ground; is that

25   correct?

1      A     Yes.

2      Q     And you stepped back?

3      A     Yes.

4      Q     Where was Mrs. Monts at that point?

5      A     I don't remember.  I got out of the way.  When

6   that taser went off, the first thing you do is get out of

7   the way.

8      Q     Where was she when you got up?

9      A     On the ground.

10     Q     You have no reason to believe that she stood up

11   before she was tasered, do you?

12     A     I don't think so.

13     Q     The truth of the matter is, she was tasered while

14   still on the ground.  Isn't that true?

15            MR. McWILLIAMS:  Object to the form of the

16         question.

17     Q     (By Mr. Ledford)  She was tasered while still on

18   the ground.  That's true, isn't it?

19     A     While she was resisting on the ground, yes, sir.

20     Q     Well, you had already stepped back at that point

21   in time?

22     A     No.  I got up to avoid being tasered, yes, but she

23   was actively -- excuse me -- actively resisting, which made

24   Officer Ambos deploy his taser.  When he did that, I got out

25   of the way.

```
 1       Q    Well, I've asked you and I'm going to ask you one
 2   more time, just to be clear --
 3       A    Okay.
 4       Q    -- but the truth of the matter is, when she was
 5   tasered by Officer Ambos, she was still on the ground by
 6   herself.  That's true, isn't it?
 7       A    No, sir.
 8            MR. McWILLIAMS:  Object to the form of the
 9       question.
10       A    No, sir.
11       Q    (By Mr. Ledford)  What's not true about it?
12       A    I was getting up off the ground when he said,
13   "Taser," okay.  I knew what was going on.  She didn't.
14       Q    When the taser gun was used, it was deployed, were
15   you on the ground or were you standing up?
16       A    I got up as the taser was -- as Officer Ambos
17   said, "Taser-taser," I got up off the ground, because I knew
18   what was fixing to happen.
19       Q    Leaving Mrs. Ambos (sic) on the ground by herself?
20       A    Yes, sir.
21       Q    Thank you.
22            MR. LEDFORD:  Give me just a second.
23            MR. McWILLIAMS:  Yes, sir.
24       Q    (By Mr. Ledford)  You were the one that handcuffed
25   Mrs. Monts?
```

```
 1      A     Yes.

 2      Q     How many video cameras did you have on your car

 3  that night?

 4      A     I've just got one in-car, one inside the car, and

 5  then one that is in the frontal view of the car.

 6      Q     Okay.  Where is the one --

 7      A     And your taser also has a video on it.

 8      Q     Yes, sir.  But the -- you actually have two

 9  cameras in the car; am I correct?

10      A     Yeah; yes, sir.

11      Q     One is on your dash?

12      A     One is on the dash, and then the other one, I can

13  just flip and it will be inside the car.

14      Q     Where is -- when you say you just flip it, it's

15  inside the car?

16      A     Like all you've got -- when you're controlling the

17  camera, it's got a second button, and I can turn that camera

18  on inside the car and get a reverse angle.  It would have

19  myself, and if somebody was in the car you'd see them as

20  well.

21      Q     Okay.  Will it actually show anything out the

22  rear-view window?

23      A     No.  You wouldn't be able to see out of it.

24      Q     Just the back seat area?

25      A     Yes.  The front seat mostly and --
```

```
 1      Q    Would Officer Ambos's car have the same equipment,
 2  as pertains to cameras?
 3      A    Yes.
 4           MR. LEDFORD:  Y'all give me just a second and let
 5      me step out and confer with my client and see if
 6      there's anything else.  I'm about through with him.
 7           (Whereupon, a two-minute break was taken.)
 8      Q    (By Mr. Ledford)  Officer Gaiter, have you ever
 9  had occasion to go to Mrs. Monts's residence?
10      A    I'm sorry.  Can you -- what --
11      Q    Have you ever been to where she lives?
12      A    Yes.
13      Q    On what occasion?
14      A    On a call, 911 calls.
15      Q    How many times?
16      A    Just a rough guesstimation, three, maybe four.
17      Q    Have you been to her residence after this
18  incident?
19      A    Yes, sir.
20      Q    How many times?
21      A    Once.
22      Q    Why?
23      A    We got a call about a disturbance--we didn't know
24  where it was coming from--over in Cripple Creek Apartments,
25  so we went over there to see what was going on.  Mrs. Monts
```

1    and her husband were actually involved in some kind of

2    incident, and her son as well.  My supervisor told me, "Just

3    go ahead and go back to your car and just wait," just

4    because they were aware that we had had a previous dealing.

5    She and her husband came out to the patrol car and started

6    shouting at me, telling me I wasn't supposed to be there and

7    a whole bunch of other stuff.  My -- she called the Chief of

8    Police at the time, and he voiced his opinion about her

9    calling him as well, said he shouldn't have given her his

10   phone number, because she called him at 3:00 in the morning,

11   disturbing him.

12       Q    Did you give her his phone number?

13       A    No; she already had it.  He gave it to her.

14       Q    You're aware that these charges, the disorderly

15   conduct and disturbing the peace, if they were made, they

16   were not pressed.  Are you aware of that?

17       A    Yes, sir.  They were the appropriate charges, but

18   when they go to the court system, it's up to them to decide

19   what they're going to do with them.

20       Q    They were actually dropped --

21       A    Dismissed, yeah.

22       Q    -- dismissed by the court?

23       A    Yeah.

24       Q    Dismissed by the court; correct?

25       A    I think they were nolle processed actually.  Yeah,

1    this is Sumter County, so I'm aware.

2         Q    Now, when you went to her residence during the

3    time you've just told us --

4         A    Uh-huh (yes).

5         Q    Yes or no?

6         A    Yes.

7         Q    -- you're familiar with the location?

8         A    Uh-huh (yes); yes, sir.

9         Q    Now, where were you, at the front door or to the

10   side or the rear?  Just where were you when she noticed you?

11        A    I came -- Lieutenant Coley and Officer Pittman

12   came to the door, and I was the third officer there.

13   Lieutenant Coley just told me, when they came out of the

14   door and started yelling and they were intoxicated and were

15   shouting, he asked me just go back to my patrol car and

16   wait, just to dissolve the situation.  I walked all the way

17   up the steps, away from them, and they still came out of

18   their apartment and confronted me.

19        Q    Now, tell me the names of the other two officers.

20   You say there were three of you.

21        A    Pittman, Officer Pittman, and Lieutenant Coley.

22        Q    Who was the officer in charge at the scene?

23        A    The Lieutenant, yes, sir.

24        Q    And he's the one that told you to go ahead and get

25   back in the car?

1       A    Well, he told me just go back to my vehicle, but I
2   still stayed around just in case there was a problem, but I
3   did go all the way out to the parking lot, which is not near
4   where they live.
5       Q    The parking lot is in front of the apartments?
6       A    Yes, sir; and they live on the back, downstairs.
7       Q    Now, the very back of those apartments, you had
8   access to the back area as well, did you not?
9       A    Yes.
10      Q    Did you go back behind the apartments at any time?
11      A    Just when we originally got there, and when I was
12  told to leave, I went ahead and left, went out to the
13  parking lot.
14      Q    Who was the first to arrive?
15      A    We all got there at the same time.
16      Q    Now, what's the Lieutenant's name that told you to
17  go back to your car?
18      A    Lieutenant Coley; Lieutenant Coley.
19      Q    Coley?
20      A    Uh-huh (yes).
21      Q    Is he still with the Americus P.D.?
22      A    Yes.
23      Q    Were you reprimanded in any way by the Americus
24  Police Department --
25      A    No.

1      Q    -- for being at the residence of --

2      A    No, sir; I have a right to be anywhere in the City

3  of Americus, by me being a law enforcement officer.  If we

4  get a 911 call, I can go anywhere, regardless of the

5  dealings or the situation.  I have the right to be anywhere.

6      Q    Have you been to her residence at any time since

7  then?

8      A    No.  I've had dealings with Mr. Monts actually

9  since then, though.

10     Q    He's not a party to this lawsuit.  You understand

11 that?

12     A    Yes, sir.  I was just letting you know that.

13          MR. LEDFORD:  Okay.  Thanks.

14          MR. McWILLIAMS:  I have no questions.  That's

15      good, you're done.  And he's going to read and sign

16      his.  As a matter of fact, we'll do it for all of them.

17          (Whereupon, the deposition was concluded at

18      11:27 a.m.)

19

20

21

22

23

24

25

DEPONENT'S SIGNATURE PAGE/ERRATA SHEET

    I DO HEREBY CERTIFY that I have read the forgoing deposition and the following corrections are required:

PAGE      LINE              CORRECTION

\_\_\_\_    \_\_\_\_    _____

\_\_\_\_    \_\_\_\_    _____

\_\_\_\_    \_\_\_\_    _____

\_\_\_\_    \_\_\_\_    _____

\_\_\_\_    \_\_\_\_    _____

\_\_\_\_    \_\_\_\_    _____

\_\_\_\_    \_\_\_\_    _____

\_\_\_\_    \_\_\_\_    _____

\_\_\_\_    \_\_\_\_    _____

\_\_\_\_    \_\_\_\_    _____

\_\_\_\_    \_\_\_\_    _____

\_\_\_\_    \_\_\_\_    _____

                    _____

                    Leslie Gaiter             (date)

Sworn to and subscribed before me
this \_\_\_\_ day of _____, 2014

_____
Notary Public, My Commission Expires:   _____

D I S C L O S U R E

GEORGIA, DOUGHERTY COUNTY.

Deposition of:  Leslie Gaiter

Pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter.

I appeared as a sole practitioner.

I did not take this deposition under any contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b).

This 12th day of July, 2014.

_____
Judy B. Scott
Certified Court Reporter B-1487

76

C E R T I F I C A T E

GEORGIA, DOUGHERTY COUNTY.

        I, Judy B. Scott, Certified Court Reporter, do hereby certify that the foregoing deposition of Leslie Gaiter, was taken before me in the cause, at the time and place, and in the presence of counsel, as stated in the caption hereto at page one hereof; that before giving his deposition, said witness was duly sworn; that the foregoing typewritten transcription is a true record of the testimony of said witness and of all proceedings had at the session at which said deposition was taken.

        I further certify that I am neither kin nor counsel to the parties in the case and in no way am I interested in the event of the cause.  I further certify that I have no contractual relationship with any party to this action, and my usual and customary charges have been applied in this case.

        This 12th day of July, 2014.

_____
Judy B. Scott
Certified Court Reporter B-1487